UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREG DEVANY,<br><br>     Plaintiff,<br><br>  - against -<br><br>UNITED PARCEL SERVICE, INC.,<br><br>     Defendant. | **ORDER**<br><br>18 Civ. 6684 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

     In this employment discrimination action, Plaintiff Greg Devany – who worked for Defendant United Parcel Service, Inc. ("UPS") as a supervisor – claims that UPS terminated him due to his actual or perceived alcoholism, in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101 et seq., the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 et seq., and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-107 et seq. (Cmplt. (Dkt. No. 3))

     UPS contends that Plaintiff's employment was terminated because he violated a "last-chance agreement," and not because of his alcoholism. (Def. Br. (Dkt. No. 72) at 20)[1] Plaintiff asserts that UPS's stated reason is pretextual. (Pltf. Br. (Dkt. No. 76) at 22)

     UPS has moved for summary judgment on all claims. (Mot. (Dkt. No. 70)) For the reasons stated below, UPS's motion will be granted as to Plaintiff's ADA and NYSHRL claims, and Plaintiff's NYCHRL will be dismissed without prejudice.

---

[1] All references to page numbers in this Order are as reflected in this District's Electronic Case Files ("ECF") system, save that references to deposition testimony will reflect the deposition page and line numbering.

## BACKGROUND

### I.   FACTS[2]

#### A.   Plaintiff's Employment at UPS

Plaintiff began working for UPS in 1993 as a package car driver.[3]  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 1)  In 2000, Plaintiff became an operations supervisor, overseeing a "'work group' of 15-16 employees."  (Id. ¶ 3)  As part of his duties as an operations supervisor, Plaintiff was required to drive on the road every day.  (Id. ¶ 5)  For example, Plaintiff was responsible for delivering "'off route' packages," such as packages that had mistakenly been loaded onto the wrong truck.  (Id.)  Plaintiff would retrieve such packages and deliver them to the appropriate truck.  (Id.)

#### B.   2007 Complaints Against Plaintiff Regarding Alcohol Use

In 2007, two UPS employees "lodged complaints" against Plaintiff for improper workplace conduct.  (Id. ¶ 6)  Both employees alleged that Plaintiff had been "drunk" or "intoxicated," and had engaged in "unprofessional" conduct.  (Id. ¶¶ 7-8)  UPS personnel met with Plaintiff and asked whether he needed help "with any alcohol problem."  (Pltf. R. 56.1

---

[2]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  Where Plaintiff disputes UPS's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed.

[3]  When Plaintiff began his employment at UPS, he obtained a Department of Transportation ("DOT") license.  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 2)  The DOT license is subject to renewal requirements.  (Id.)

Counterstatement (Dkt. No. 74) ¶ 9 (citing Devany Decl. (Dkt. No. 75-3) ¶ 62))  Plaintiff stated

that he "did not need any help."  (Id.)

### C.   The Events of February 22, 2017, and Plaintiff's Entry into a Substance Abuse Treatment Program

On February 22, 2017, Plaintiff reported to work at about 7:15 a.m.  (Def. R. 56.1

Stmt. (Dkt. No. 71 ¶ 31)  He was then under the influence of alcohol.  (Id. ¶ 13)  Plaintiff was

aware that UPS employees were prohibited from reporting to work while under the influence of

alcohol.  (Id.  ¶ 18)[4]  "Plaintiff [further] understood that an employee who smelled of alcohol or

exhibited other signs of impairment could be subjected to a 'reasonable suspicion' test" under

UPS's "Controlled Substances and Alcohol Testing Management Guide" (the "Testing Guide")

(id. ¶ 22), and Plaintiff does not dispute that he was aware that a violation of the Testing Guide

"could lead to discharge."  (Id.; see also Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 22

("Plaintiff was aware that a violation of the drug and alcohol prohibition could lead to

discharge"))

Under UPS's Testing Guide, "'[d]rug and/or alcohol testing is required by the

DOT and UPS whenever a trained manager or supervisor has reason to believe that a covered

employee has violated DOT drug use or alcohol misuse prohibitions.'"  (Def. R. 56.1 Stmt. (Dkt.

No. 71) ¶ 20 (quoting Devany Dep., Ex. 8 (Testing Guide) (Dkt. No. 71-7) at 29))  As discussed

---

[4]  UPS maintains a policy book (the "Policy Book") that sets forth the policies under which the
company operates.  (Id. ¶ 15)  The Policy Book contains "'work rules that prohibit the
unauthorized use or possession of alcohol or controlled substances while working.'"  (Id. ¶ 16
(quoting Devany Dep., Ex. 6 (Policy Book) (Dkt. No. 71-5) at 34))  The Policy Book provides
that "[t]he unauthorized use, sale, or possession of alcohol or controlled substances while at
work, on company property, or while on company business is strictly prohibited."  (Id. ¶ 17
(quoting Devany Dep., Ex. 6 (Policy Book) (Dkt. No. 71-5) at 34))  Plaintiff was aware of the
Policy Book and its prohibition against employees reporting to work while under the influence of
alcohol.  (Id. ¶ 18)

above, Plaintiff's work at UPS was subject to a DOT license.  (Id. ¶¶ 2, 21)  Accordingly, he was a "covered employee."  (Id. ¶¶ 2, 20-21)

Plaintiff was instructed to report to Division Manager Thomas Francis's office, where he met Francis and Willie Rodriguez, another UPS supervisor.  (Id. ¶¶ 31-33)  "At the meeting, [] Francis observed that Plaintiff smelled of alcohol," and after the meeting, Rodriguez accompanied Plaintiff to a local clinic for a "reasonable suspicion" test.  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 34; see also Def. R. 56.1 Stmt. (Dkt. No. 71 ¶ 34 (citing Francis Dep. (Dkt. No. 71-21) at 47:1-25)))  A "Breath Alcohol Screen Test" was administered to Plaintiff at 10:22 a.m., about three hours after he had reported to work.  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 35)  The test revealed a blood alcohol level of .027.  (Id. ¶ 36)

Pursuant to UPS's Testing Guide, when an employee tests positive for alcohol, a medical review officer will provide the employee with a listing of substance abuse treatment programs ("SAPs").  (Id. ¶ 23 (citing Devany Dep., Ex. 8 (Testing Guide) (Dkt. N. 71-7) at 34))  If the substance abuse treatment provider determines that treatment is necessary, UPS provides the employee with a one-time rehabilitation opportunity, as discussed below.[5]  (Id. ¶ 24)

After meeting with Francis and Rodriguez, Plaintiff contacted Aetna and informed Aetna that "'he was going out on disability.'"  (Id. ¶ 38 (citation omitted))  That same day, Plaintiff contacted a UPS nurse to request a Substance Abuse Program – i.e. a SAP.  (Id. ¶ 39)  Later that week, an SAP professional, Lorraine German, evaluated Plaintiff and referred him to Seafield Clinic.  (Id. at ¶ 40)

_____

[5]  UPS also maintains a policy governing ADA accommodations.  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 10)  This policy applies to employees who have or appear to have a disability, and details the procedure for requesting and identifying reasonable accommodations for an alleged disability.  (Id. ¶¶ 11-12)  Prior to February 22, 2017, Plaintiff never sought an accommodation related to his use of alcohol.  (Id. ¶ 13)

On March 29, 2017, Plaintiff entered into an "Employee Agreement:  Alcohol and/or Drug Rehabilitation Agreement" (the "Alcohol Rehabilitation Agreement") with UPS. (Id. at ¶ 52 (citing Devany Dep. (Dkt. No. 71-2) at 147:1-25; id., Ex. 12 (Alcohol Rehabilitation Agreement) (Dkt. No. 71-11)); see also Devany Dep. (Dkt. No. 71-2) at 147:5-20) (Devany confirming that the Alcohol Rehabilitation Agreement bears his signature))[6]

The Alcohol Rehabilitation Agreement reads as follows:

I, Greg Devany, agree that, in consideration of a one-time alcohol and/or drug rehabilitation opportunity and as a condition of continuing employment with [UPS], I shall do the following:

1.  I shall voluntarily submit to a return-to-work alcohol/drug test so that the Medical Review Officer (MRO) may ensure that I am alcohol and/or drug free;

2.  I shall voluntarily submit to unannounced alcohol/drug testing, as determined by the MRO in consultation with the aftercare treatment professional;

3.  I shall remain drug free and alcohol free upon my return-to-work.  I agree to attend aftercare treatment programs as outlined by my aftercare treatment professional in consultation with [the] MRO, for the period of time recommended.  I will send documentation of my attendance at such aftercare program to my MRO. I also authorize my MRO to verify my participation and progress.

I understand that the following will result in my discharge from [UPS]:

1.  Failure to successfully complete rehabilitation, or

2.  Any positive specimen, or

3.  Failure to comply with the aftercare treatment program.

---

[6] Although Plaintiff does not dispute that he agreed to the terms of the Alcohol Rehabilitation Agreement (see Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 53), he nonetheless objects to this Court's consideration of the Alcohol Rehabilitation Agreement.  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 52)  Because Plaintiff does not explain the basis for his objection – other than to assert that the "material cited cannot be presented in a form that would be admissible in evidence" (id.) – his objection overruled.

(Devany Dep., Ex. 12 (Alcohol Rehabilitation Agreement) (Dkt. No. 71-11); see also Def. R.

56.1 Stmt. (Dkt. No. 71) ¶ 53 (quoting Devany Dep., Ex. 12 (Alcohol Rehabilitation Agreement)

(Dkt. No. 71-11)))[7]

   On April 12, 2017, Plaintiff completed the Seafield Clinic's alcohol abuse

treatment program.[8] (Id. at ¶ 42)

---

[7] The parties dispute the purpose of the one-time rehabilitation opportunity referenced in the
Alcohol Rehabilitation Agreement.  UPS claims that the "purpose of the one-time rehabilitation
opportunity is to allow the employee to seek treatment before having to navigate the disciplinary
process."  (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 25 (citing Henry Dep. (Dkt. No. 71-18) at 61:1-
25))  According to UPS, "[a]n employee who reports to work under the influence – regardless of
whether he or she is recommended to attend treatment – is terminated upon return from
treatment," after which the "employee may then elect to seek reinstatement through the
Employee Dispute Resolution Program ('EDR')."  (Id. ¶ 26 (citing Henry Dep. (Dkt. No. 71-18)
at 38:1-25))

Plaintiff argues that, pursuant to the Testing Guide, a UPS employee can "return to work after
they finished their rehabilitation," and that the Testing Guide "does not mention the consequence
the employee may face but describes how an employee returns to work."  (Pltf. R. 56.1
Counterstatement (Dkt. No. 74) ¶ 25 (citing Goldberg Decl., Ex. 3 (Testing Guide) (Dkt. No. 75-
4)))  According to Plaintiff, the Testing Guide "outlines how an individual can return to work
after testing positive," but does not provide for "automatic termination."  (Id. at ¶ 26)  The
Testing Guide instead outlines seven steps "that enable[] the employee to return to work if the
steps are followed."  (Id. (citing Goldberg Decl., Ex. 3 (Testing Guide) (Dkt. No. 75-4); Vaca
Dep., Ex. 10 (Dkt. No. 75-11) at 19:6-10))

At deposition, Glenn Henry, a UPS Regional Human Resources Manager, and Henry Vaca, a
UPS Human Resources Manager, testified that it was standard protocol at UPS in the North
Atlantic District for an employee who was found to have been under the influence of alcohol at
work to be terminated.  (Henry Dep. (Dkt. No. 71-18) at 39:12-25, 40:1-3; Vaca Dep. (Dkt. No.
75-11) at 19:6-12)

[8] Plaintiff does not dispute that he underwent six weeks of alcohol abuse treatment between
February 27, 2017 and April 12, 2017.  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶¶ 41-42)

According to Plaintiff, during the six weeks of treatment, Plaintiff's "alcoholism prevented him
from working and concentrating" (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 146 (citing
Devany Decl. (Dkt. No. 75-3) ¶ 57)), and his "alcoholism affected/impaired various parts of his
body and mind."  (Id. ¶ 147 (citing Devany Decl. (Dkt. No. 75-3) ¶ 58))  Plaintiff's "alcoholism
caused him to have trouble sleeping, made him anxious and restless and caused his heartbeat to
quicken."  (Id. ¶ 148 (citing Devany Decl. (Dkt. No. 75-3) ¶ 59))

### D.   May 8, 2017 "Return to Work" Call

After Plaintiff's release from the Seafield Clinic, a "Return to Work" call was scheduled for May 8, 2017.  (Id. ¶ 47)  Present on the call were Plaintiff, Francis, and an American Substance Abuse Professionals ("ASAP") caseworker, Keont'A McMiller.  (Id. ¶ 48; see also Devany Dep., Ex.  13 (Return to Work Call Notes) (Dkt. No. 71-12) (noting that McMiller is a "case manager with American Substance Abuse Professionals"))

During the May 8, 2017 call, Plaintiff was informed that he would be required to attend one counseling session per week for six weeks, and that if he failed to attend these sessions, his employment at UPS would be terminated.[9]  (Id. ¶ 49 (citing Devany Dep. (Dkt. No.

---

Plaintiff asserts, however, that he "successfully completed a six-week treatment program at Seafield to address [his] alcoholism" (Devany Decl. (Dkt. No. 75-3) ¶ 6), and he testified at deposition that he "no longer [was] suffer[ing] from alcoholism" after he completed the six-week treatment program.  (See Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 43 (citing Devany Dep. (Dkt. No. 71-2) at 135:1-25, 136:1-25, 137:1-25, 138:1-25, 139:1-25, 140:1-25 and Devany Dep., Ex. 11 (Dkt. No. 71-10) (EEOC Charge of Discrimination)))

In his opposition to Defendant's summary judgment motion, Plaintiff asserts that – in testifying that he was no longer suffering from alcoholism – he did not intend to imply that his alcoholism was entirely resolved.  Plaintiff states that he intended to convey "that he was no longer in a place where he could not work or fully function."  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 43 (citing Devany Decl. (Dkt. No. 75-3) ¶ 60 ("While I stated that I no longer 'suffered from alcoholism' what I meant was that I was finally able to work again and was fulling functioning")); see also Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 43 (citing Devany Dep. (Dkt. No. 71-2) at 135:1-25, 136:1-25, 137:1-25, 138:1-25, 139:1-25, 140:1-25 and Devany Dep., Ex. 11 (Dkt. No. 71-10) (EEOC Charge of Discrimination)))  In the charge of discrimination that Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC"), however, Plaintiff asserted that – after he finished the six weeks of treatment – he was no longer suffering from alcoholism:  "I went to treatment for approximately six weeks and was no longer suffering from alcoholism when I finished my treatment."  (See EEOC Charge (Dkt. No. 86) at 2); see also Devany Dep. (Dkt. No. 71-2) at 138:2-13)

[9]  In opposing summary judgment, Plaintiff asserts that the caseworker never said that he would be required to attend the counseling sessions "as a condition of potentially returning to work." (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 49)  According to Plaintiff, the caseworker merely told him that he would be returning to work and that was why the call was taking place. (Id. (citing Devany Decl. (Dkt. No. 75-3) ¶¶ 10-11; Return to Work Call Notes, Ex. 7 (Dkt. No.

71-2) at 177:1-25); Devany Dep., Ex. 13 (Return to Work Call Notes) (Dkt. No. 71-12))[10]  The

caseworker also told Plaintiff that if he had any difficulty scheduling the aftercare counseling

sessions, he should contact her.  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 50; see also

Return to Work Call Notes, Ex. 7 (Dkt. No. 75-8) at 3, 6; Devany Dep., Ex. 13 (Return to Work

Call Notes) (Dkt. No. 71-12) at 2, 5 (indicating both that if Plaintiff "had trouble scheduling with

an EAP counselor" to let the ASAP know, and that Plaintiff was told, "if you have any questions

or if there is any part of your program that you are confused about, please contact Jasmine or me

right away.  Our numbers are listed on the aftercare letter – we are here to help you be successful

in your program!"); Devany Dep. (Dkt. No. 71-2) at 182:1-25)[11]

---

75-8))  Given Plaintiff's deposition testimony and other evidence before the Court, however, no
reasonable jury could accept his account of the May 8, 2017 call.

At his deposition, Plaintiff was asked:  "So [the caseworker] said to you the SAP has
recommended that you attend one ASAP counseling session per week for a total of six sessions.
Do you recall her telling you that."  Plaintiff answered "Yes."  (Devany Dep. (Dkt. No. 71-2) at
177:2-8)  Plaintiff was then asked, "So you knew that in this call that you had to go to six
sessions."  Plaintiff answered "Yes."  (Id. at 177:20-22)  And later in the deposition Plaintiff was
asked, "If you did not complete the aftercare program, you would be terminated[?]"  Plaintiff
answered, "Yes.  I wasn't trying not to complete the aftercare program."  (Id. at 180:17-25)
[10]  The Return to Work Call Notes confirm that Plaintiff was told during the May 8, 2017 call
that the substance abuse treatment provider had recommended that he "attend one EAP
counseling session per week for a total of 6 sessions."  (See Return to Work Call Notes, Ex. 7
(Dkt. No. 75-8) at 2; Devany Dep., Ex. 13 (Return to Work Call Notes) (Dkt. No. 71-12) at 1)
Although Plaintiff himself cites the Return to Work Call Notes (see Pltf. R. 56.1
Counterstatement (Dkt. No. 74) ¶ 49), he argues – without explanation – that they "cannot be
presented in a form that would be admissible in evidence."  (Pltf. R. 56.1 Counterstatement (Dkt.
No. 74) ¶ 50)  Given that Plaintiff does not explain the basis for the alleged inadmissibility of the
call notes, his objection is overruled.  To the extent that Plaintiff might contend that the notes are
hearsay, they are not being offered for their truth, but only to demonstrate what was said to
Plaintiff during the May 8, 2017 call.  See Fed. R. Evid. 801(c).  The notes also appear to be
admissible as a recorded recollection.  See Fed. R. Evid. 803(5).

[11]  To the extent that Plaintiff objects to the Return to Work Call Notes (see Pltf. R. 56.1
Counterstatement (Dkt. No. 74) ¶¶ 49-50), his objection is overruled for the reasons stated
above.

During the May 8, 2017 call, the caseworker read and reviewed with Plaintiff the Alcohol Rehabilitation Agreement he had entered into with UPS on March 29, 2017.  (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 52 (citing Devany Dep. (Dkt. No. 71-2) at 147:1-25; Devany Dep. Ex. 12 (Alcohol Rehabilitation Agreement) (Dkt. No. 71-11); see also Return to Work Call Notes, Ex. 7 (Dkt. No. 75-8) at 6 ("Cm read and reviewed EE Agreement.  Cm asked to initial and date by his first signature.  Cm asked manager to sign and date as the UPS representative."); see also Devany Dep., Ex. 13 (Return to Work Call Notes) (Dkt. No. 71-12) at 5 (same); see also Devany Dep. (Dkt. No. 71-2) at 181:25, 182:2-5, 184:7-25, 185:1-25 (Plaintiff discussing Exhibit 13 – the Return to Work Call Notes – and confirming that his "cm" or "case manager" read the Alcohol Rehabilitation Agreement to him))

In a May 8, 2017 letter, American Substance Abuse Professionals informed Plaintiff that his SAP, Lorraine German, had recommended that he "[c]omplete 1 EAP counseling session per week for a total of 6 sessions (1x per week for 6 weeks)."  In the letter, Plaintiff was warned of the consequences of not completing the recommended aftercare program: "As stated in the UPS Alcohol and/or Drug Rehabilitation Agreement you signed, a positive test result, or failure to comply with any of the aftercare program requirements, may jeopardize your employment."  (See Devany Dep., Ex. 15 (May 8, 2017 ASAP Letter) (Dkt. No. 71-13); see also Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 51 (citing Devany Dep. (Dkt. No. 71-2) at 174:1-25, 180:1-25, 181:1-25, 182:1-25, 183:1-25, 184:1-25, 185:1-25; Devany Dep., Ex. 15 (May 8, 2017 ASAP Letter) (Dkt. No. 71-13)))

### E. **Plaintiff's Initial Termination, the Referral to the Employee Dispute Resolution Program, and the Last Chance Agreement**

After this call, Francis and a UPS Human Resources employee terminated Plaintiff's employment.  During the meeting with Plaintiff, he was informed of his right to use

the Employee Dispute Resolution Program (the "EDR program") to seek reinstatement.  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶¶ 54-55 (citing Francis Dep. (Dkt. No. 71-21) at 74:1-25); see also Devany Dep. (Dkt. No. 71-2) at 74:20-22)

UPS's EDR program has five steps:  "(1) Open Door, (2) Facilitation, (3) Peer Review, (4) Mediation, and (5) Arbitration."  (Id. ¶¶ 27-28 (citing Devany Dep., Ex.7 (Dkt. No. 71-6)))  The "Open Door" step "involves an informal meeting with the employee, a[n] HR representative, and other parties involved in an attempt to resolve the dispute."  (Id. ¶ 29)  If the employee remains dissatisfied after the Open Door meeting, the employee may move on to the next step.  (Id.)

"After May 8, 2017, Plaintiff began the EDR process seeking reinstatement to his position."  (Id. ¶ 58 (citing Devany Dep. (Dkt. No. 71-2) at 77:1-25))  An Open Door meeting took place on June 2, 2017.[12]  (Id. ¶ 59)  The meeting was attended by Plaintiff, UPS Regional Human Resources Director Glenn Henry, and UPS Human Resources Manager Henry Vaca.[13]  (Id. ¶ 62)  At this meeting, the UPS Human Resources managers offered to reinstate Plaintiff on the condition that he sign a "Return to Work Agreement and General Release," which the parties refer to as a "Last Chance Agreement." [14]  (Id. ¶¶ 60, 66; see also Devany Dep., Ex. 16 (Dkt. No.

---

[12]  To the extent that UPS maintains that the Open Door meeting took place on June 22, 2017 (see Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 59), the reference to June 22, 2017 appears to be a typographical error.  (See id. at ¶¶ 60, 66 (indicating that the Open Door meeting took place on June 2, 2017); see also Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 59 (citing Devany Decl. (Dkt. No. 75-3) ¶ 21))

[13]  The parties dispute whether District Manager Cannon was present.  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 62 (citing Devany Decl. (Dkt. No. 75-3) ¶ 17))

[14]  It is undisputed that UPS has no obligation, under the EDR program, to reinstate an employee who has been terminated.  (Id. at ¶ 61; see id. ("UPS is not required to offer an employee their job back through the EDR program."))

71-14) (the "Last Chance Agreement")) Plaintiff signed the Last Chance Agreement.[15] (Pltf. R.

56.1 Counterstatement (Dkt. No. 74) ¶ 67 (citing Devany Decl. (Dkt. No. 75-3) ¶ 20))

"Under the terms of the Last Chance Agreement, Plaintiff agreed 'that the

agreement constitutes a final warning and [that] future violation of UPS policies or other conduct

by [Plaintiff] that's detrimental to the company can lead to disciplinary action up to

termination.'" (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 68 (second alteration added) (citation

omitted)) The Last Chance Agreement provides that "UPS agrees to reinstate [Plaintiff] as an

active UPS employee through the Open Door phase of the UPS EDR Process," but does "not

guarantee any specific duration of employment with UPS. . . ." (See Last Chance Agreement

(Dkt. No. 71-14) at 1; id. (stating that the Last Chance Agreement is "not a contract of

employment," and that upon Plaintiff's "reinstatement he [will] remain an at-will employee . . .

[who could be terminated] at any time for any reason and with or without cause")) Plaintiff's

Last Chance Agreement contains a "Final Warning Section" that reads as follows:

> [Devany] agrees that this Agreement constitutes a final warning and that future
> violations of UPS policies by [Devany], or other conduct by [Devany] that is
> detrimental to the Company's interests, can lead to disciplinary action up to and
> including termination of his employment. . . .[Devany] also understands that he
> will fully comply with the terms of his SAP program and be subject to the
> aftercare specifications of said program.

(Id. at 3; see also Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 60 (noting that the "Last Chance Agreement

. . . expressly required [Plaintiff] to complete all required aftercare"); id. ¶ 69) Plaintiff

understood at the time that a failure to comply with the Last Chance Agreement constituted

grounds for termination. (Id. ¶ 70)

---

[15] Plaintiff "[a]grees that UPS gave him the [Last Chance Agreement] and told him that he could take it home. . . . Since they told [him] that the agreement would need to be signed before he could return to work, Plaintiff signed the agreement quickly." (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 67 (citing Devany Decl. (Dkt. No. 75-3) ¶ 20))

### F.    Plaintiff's Return to Work and Failure to
######    Attend Aftercare Counseling Sessions

Plaintiff returned to work in June 2017 after signing the Last Chance Agreement.
(Id. ¶ 71)

Plaintiff complains that Division Manager Francis was hostile to Plaintiff after his return, closely scrutinized him, and critiqued his work.  Francis told Plaintiff, "'I wish I had never [] brought you back.'"  In a mocking and ridiculing way, Francis would ask Plaintiff, "'are you ok?'"  Francis's comments and behavior made Plaintiff feel that Francis did not believe he was stable, and Francis's "close scrutiny, critiques and ridicule made [Plaintiff] stressed."  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶¶ 113-124 (citing Devany Decl. (Dkt. No. 75-3) ¶¶ 25-32, 54; Devany Dep. (Dkt. No. 75-2) 15:25, 16:2-21; Goldberg Decl., Ex. 14 (Dkt. No. 75-15) (the Complaint)))[16]

Plaintiff's first aftercare counseling session took place on August 12, 2017. (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 78)  As discussed above, under the Last Chance Agreement, Plaintiff was obligated to attend one counseling session per week for six weeks. (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 72)  The August 12, 2017 counseling session was the only counseling session that Plaintiff attended.  (Id. ¶ 73)  Plaintiff contends that, throughout the summer, he unsuccessfully tried to schedule additional sessions.  According to Plaintiff, few providers accepted his insurance.[17]  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 78 (citing Devany Decl. (Dkt. No. 75-3) ¶¶ 38-40, 42))

---

[16]  As discussed below, UPS disputes Plaintiff's account, which it contends is contradicted by his deposition testimony.  (Def. R. 56.1 Counterstatement (Dkt. No. 77) at ¶¶ 113-24 (citing Francis Dep. (Dkt. No. 77-4) 82:1-25; Francis Dep. (Dkt. No. 71-21) at 107:1-25, 108:1-25, 109:1-25; Devany Dep. (Dkt. No. 77-2) at 226:1-25; Devany Dep. (Dkt. No. 71-2) at 227:1-25))

[17]  UPS asserts that Plaintiff's caseworker repeatedly asked Plaintiff to schedule aftercare sessions.  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 74 (citing Leanman Dep. (Dkt. No. 71-23) at 25:1-

Plaintiff succeeded in scheduling one follow-up counseling session but cancelled the appointment because he needed dental care: "I did schedule it, the second session, which I didn't attend because I had a dentist issue." (Devany Dep. (Dkt. No. 71-2) at 245:7-9; see id. at 245-10:11 (when asked "[w]hat kind of dentist issue," Plaintiff testified, "I have caps."); id. at 245:19-24 (explaining that the dentist was "making a bridge right here. Can you see the wires . . . . That's what it was. I don't know what to tell you. I had a dentist appointment."); Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 80 (citing Devany Dep. (Dkt. No. 71-2) at 245:1-25, 256:1-25, 247:1-25); see also Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 80 (citing Devany Decl. (Dkt. No. 75-3) ¶ 46); see also Devany Decl. (Dkt. No. 75-3) ¶ 46 ("I had to cancel an appointment . . . because of a dental issue.")) Plaintiff tried to schedule a telephonic counseling session, but his counselor refused to conduct the session by telephone. (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 81 (citing Devany Decl. (Dkt. No. 75-3) ¶¶ 47-48)

It is undisputed that Plaintiff never informed anyone at UPS that he was having difficulty scheduling his aftercare counseling sessions. (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 65)

### G.   Termination

On October 9, 2017 – four months after Plaintiff's return to work – Kathy Leaman, an ASAP case manager, sent a memorandum to UPS stating that Plaintiff had not attended six counseling sessions and thus was not in compliance with his mandated aftercare program. (Id. ¶ 84)

---

25 and Leaman Dep., Ex. 1 (Dkt.No. 71-24) (case management notes))) Plaintiff responds that he informed the caseworker "that he was trying to schedule the sessions," "but was having a difficult time scheduling an appointment." (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶¶ 74-75 (citing Devany Decl. (Dkt. No. 75-3 ¶¶ 38-40, 42))

Plaintiff took disability leave from October 9, 2017 through October 23, 2017. (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 87 (citing Devany Decl. (Dkt. No. 75-3) ¶ 55)) Plaintiff claims that he took disability leave because of "the stress he was feeling from Francis." (Id. ¶ 127 (citing Devany Decl. (Dkt. No. 75-3) ¶ 54))[18]

On November 2, 2017, Plaintiff met with Division Manager Francis, Human Resources Manager Doug Trandiak, and Luis Torres, Plaintiff's direct supervisor. (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 88)[19] At this meeting, "UPS advised Plaintiff that he was being terminated for non-compliance with the Last Chance Agreement and [the Alcohol Rehabilitation Agreement]." (Id.) Plaintiff was given another EDR packet at this meeting, but he did not utilize the EDR process a second time. (Id. ¶ 90)

## II.    PROCEDURAL HISTORY

The Complaint was filed on July 26, 2018, and alleges disability discrimination in violation of the ADA, the NYSHRL, and the NYCHRL. (Cmplt. (Dkt. No. 3))

On March 12, 2020, UPS moved for summary judgment. (Dkt. No. 70)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes

---

[18] UPS disputes Plaintiff's account, which it contends is contradicted by his deposition testimony. (Def. R. 56.1 Counterstatement (Dkt. No. 77) ¶ 127 (citing Devany Dep. (Dkt. No. 77-2) at 226:1-25; Devany Dep. (Dkt. No. 71-2) at 227:1-25))

[19] UPS refers to the date of termination as "November 2, 2019." (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 88) The reference to 2019 is another typographical error.

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "When no rational jury could find

in favor of the nonmoving party because the evidence to support [his] case is so slight, there is

no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v.

Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

        In deciding a summary judgment motion, the Court "resolves all ambiguities, and

credits all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (citation,

quotation marks, and alteration marks omitted).  However, "a party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment. . . . Mere conclusory allegations or denials . . . cannot by themselves create a genuine

issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166

(2d Cir. 2010) (citation, quotation marks, and alteration marks omitted).  "'Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for

the court on summary judgment.'"  Eviner v. Eng, No. 13-CV-6940-ERK, 2015 WL 4600541, at

*6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

        "In cases based on allegations of discriminatory retaliation, courts must use 'an

extra measure of caution' in determining whether to grant summary judgment 'because direct

evidence of discriminatory intent is rare and such intent often must be inferred from

circumstantial evidence.'"  Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239 (PAE)

(THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll

Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).  However, "the salutary purposes of summary

judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination

cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (citation and quotation marks omitted).

As in any other case, a plaintiff in a discrimination case "must do more than simply show that there is some metaphysical doubt as to the material facts.  [He] must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (citations and quotation marks omitted); see also Risco v. McHugh, 868 F.Supp.2d 75, 98 (S.D.N.Y. 2012) ("[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment . . . [and] must offer some hard evidence showing that [his] version of the events is not wholly fanciful." (citations and quotation marks omitted)).

### B.        Disability Discrimination Claims Under the ADA and the NYSHRL

The ADA prohibits discrimination "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Claims alleging disability discrimination in violation of the ADA are subject to the three-step burden-shifting framework set forth in McDonell Douglas Corporation v. Green, 411 U.S. 792 (1973).  See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Programs, Inc., 198 F.3d 68, 72 (2d Cir. 1999).

Under the McDonnell Douglas framework, "[a] plaintiff must [first] establish a prima facie case [of discrimination]; [second] the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and [third] the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

Disability discrimination claims under the NYSHRL are analyzed under the same standard used for ADA discrimination claims.  Piligian v. Icahn Sch. of Med. at Mount Sinai,

490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020); see also Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n. 1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims.").  Accordingly, where "a plaintiff has a disability under the ADA, that plaintiff's NYSHRL claim 'survives or fails on the same basis as [his] ADA claim.'"  Nelson v. City of New York, No. 11 Civ. 2732 (JPO), 2013 WL 4437224, at *6 (S.D.N.Y. Aug. 19, 2013) (quoting Gingold v. Bon Secours Charity Health Sys., 768 F. Supp. 2d 537, 543 n.6 (S.D.N.Y. 2011)).

### C.   Disability Discrimination Claims Under the NYCHRL

"'[C]ourts must analyze NYCHRL claims independently from any federal and state law claims.'"  Piligian, 490 F. Supp. 3d at 717 (quoting Mihalik v. Credit Agricole Cheuvreux N. America, Inc., 715 F.3d 102, 109 (2d Cir. 2013)).  "'The NYCHRL creates a lower threshold for actionable conduct and must be construed liberally in favor of discrimination plaintiffs, meaning that a defendant may be liable under the NYCHRL but not under state or federal statutes.'"  Id. (quoting Cain v. Esthetique, 182 F. Supp. 3d 54, 71 (S.D.N.Y. 2016)).  Accordingly, "[a] plaintiff must, by a preponderance of the evidence, show only that he was treated less well, at least in part for a discriminatory reason."  Id. at 717-18 (citation and quotation marks omitted).

## II.   ANALYSIS

### A.   ADA and NYSHRL Claims

UPS contends that it is entitled to summary judgment on all of Plaintiff's claims because (1) Plaintiff has not established a prima facie case of discrimination; (2) UPS has proffered a legitimate, non-discriminatory reason for Plaintiff's termination; and (3) Plaintiff has

not demonstrated that UPS's asserted reason for Plaintiff's termination is pretextual.  (Def. Br. (Dkt. No. 72) at 17-30)

### 1. *Prima Facie* **Case**

UPS argues that Plaintiff has not established a <u>prima facie</u> case because the evidence does not demonstrate that (1) Plaintiff suffers from a disability; or (2) Plaintiff suffered an adverse employment action as a result of his disability.  (Def. Br. (Dkt. No. 72) at 17-20) Plaintiff counters that he was regarded as disabled by UPS, that he had a record of being disabled, and that he suffered an adverse employment action – the termination of his employment – as a result of his disability.  (Pltf. Br. (Dkt. No. 76) at 17-22)

To establish a <u>prima facie</u> case of employment discrimination under the ADA, a plaintiff must show "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability."  <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 134 (2d Cir. 2008); <u>see also</u> <u>Heyman</u>, 198 F.3d at 72; <u>Kinneary v. City of New York</u>, 601 F.3d 151, 158 (2d Cir. 2010) (holding that proof of the same four elements is required under the NYSHRL).

"Generally, the burden of establishing a <u>prima facia</u> case is 'minimal.'  But a plaintiff cannot do so with 'purely conclusory allegations of discrimination, absent any concrete particulars.'"  <u>Wein v. New York City Dep't of Educ.</u>, No. 18 Civ. 11141 (PAE), 2020 WL 4903997, at *12 (S.D.N.Y. Aug. 19, 2020) (citations omitted); <u>see also</u> <u>id.</u> (explaining that at the third step of the <u>McDonnell Douglas</u> framework, "the presumption of discriminatory intent drops away, and the plaintiff must show 'that the real reason for the adverse employment decision was

discrimination.'" (citation omitted)).  Moreover, "Plaintiff must establish that the disability was the 'but-for' cause of the adverse action."  Piligian, 490 F. Supp. 3d at 717 (citing Natofsky v. City of New York, 921 F. 3d 337, 349 (2d Cir. 2019)); see also Natofsky, 921 F. 3d at 349 ("We conclude that 'on the basis of' in the ADA requires a but-for causation standard.").

Here, only the second and fourth elements for a prima facie case are at issue: whether Plaintiff suffers from a disability, and whether he suffered an adverse employment action because of his disability.

### a.   Whether Plaintiff Suffers from a Disability

In arguing that the evidence does not support Plaintiff's claim that he suffers from a disability, UPS asserts that (1) alcoholism is not a per se disability under the ADA; (2) Plaintiff claimed that he had been cured as a result of the six-week alcohol abuse treatment program that he attended; and (3) Plaintiff was not "regarded as" disabled by his UPS managers.  (Def. Br. (Dkt. No. 72) at 17-19)

Plaintiff counters that he was regarded as disabled by Francis; that the NYSHRL's definition of disability is more liberal than that of the ADA; and that his employment record at UPS demonstrates that he is disabled under the NYSHRL.  (Pltf. Br. (Dkt. No. 76) at 18-20)

Under the ADA, an individual is disabled if he or she (1) has "a physical or mental impairment that substantially limits one or more major life activities"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1); see also Widomski v. State Univ. of N.Y., 748 F.3d 471, 474 (2d Cir. 2014).

"[T]he definition of 'disability' is broader under . . . the NYSHRL . . . than under the ADA."  Hernandez v. City of New York, No. 11 Civ. 6644 (KPF) (DF), 2015 WL 321830, at

*25 (S.D.N.Y. Jan. 23, 2015) (citing N.Y. Exec. L. § 292(21)).  "Under the NYSHRL . . . any 'medically diagnosable impairment is necessarily a disability' for discrimination-claim purposes."  Lyman v. New York & Presbyterian Hosp., No. 11 Civ. 3889 (KPF), 2014 WL 3417394, at *6 (S.D.N.Y. July 14, 2014) (citation and alteration marks omitted).

The ADA and the NYSHRL both "treat alcoholism as an impairment that can form the basis of a disability discrimination suit."  Makinen v. City of New York, 857 F.3d 491, 495 (2d Cir. 2017).  However, alcoholism is not a per se disability under the ADA.  Rodriguez v. Verizon Telecom, No. 13-cv-6969 (PKC) (DCF), 2014 WL 6807834, at *4 (S.D.N.Y. Dec. 3, 2014); see id. (plaintiff's treatment at a drug rehabilitation program and long history of addiction found insufficient to establish a disability, as they did not show a substantial limitation on one or more of a major life activity).  Accordingly, under the ADA, a "plaintiff must still show that the impairment limited one or more of his 'major life activities.'"  Vandenbroek v. PSEG Power, CT LLC, 356 F. App'x 457, 459 n.2 (2d Cir. 2009).  "Major life activities are activities that are of central importance to daily life."  Lam v. New York City Dep't of Educ., No. 18 Civ. 2756 (PGG), 2019 WL 2327655, at *6 (S.D.N.Y. May 30, 2019) (citation and quotation marks omitted).  They "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

At his deposition, when asked whether he continued to suffer from alcoholism after the six-week treatment program at Seafield Clinic, Plaintiff answered that he did not (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 43):

> Q: And after you were in the treatment for six weeks, did you no longer suffer from alcoholism?

[Plaintiff]: Yes, I wasn't drinking.

Q: Well, my question is, did you still suffer from alcoholism?

[Plaintiff]: No.

[Plaintiff's attorney objects]

. . .

Q: . . . Is it your testimony that after your six weeks of treatment you no longer suffered from alcoholism anymore?

[Plaintiff's attorney objects]

[Plaintiff]:  Correct.

(Devany Dep. (Dkt. No. 71-2) at 135:19-25, 136:1-2, 139:22-25, 140:2)

Plaintiff's deposition testimony is consistent with his EEOC charge, in which he maintained that – after he finished the six weeks of treatment at the clinic – he was no longer suffering from alcoholism.  (Devany Dep. (Dkt. No. 71-2) at 136:19-25, 137:1-25, 138:1-25, 139:1-5)  Plaintiff's EEOC charge states:  "I went to treatment for approximately six weeks and was no longer suffering from alcoholism when I finished my treatment."  (See EEOC Charge (Dkt. No. 86) at 2 ¶ 8)

As discussed above, in a declaration submitted in opposition to Defendant's summary judgment motion, Plaintiff attempts to backtrack from his deposition testimony – and the statements in his EEOC charge – concerning his recovery from alcoholism.  Plaintiff contends that he "did not use the word 'suffer' to imply that his alcoholism was over.  His use of the term alcoholism was meant to reflect that he was no longer in a place where he could not work or fully function."  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 43 (citing Devany Decl. (Dkt. No. 75-3) ¶ 60))  Plaintiff goes on to assert that, "[a]s a result of the alcoholism, I had trouble sleeping, I was anxious and restless, and it caused my heartbeat to quicken. While I

21

stated that I no longer 'suffered from alcoholism' what I meant was that I was finally able to work again and was fully functioning.  Alcoholism is a disease that I will always have to work to manage."  (Devany Decl. (Dkt. No. 75-3) ¶¶ 59-61)

"'[I]t is well settled in this circuit that a party's affidavit [or declaration] which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.'"  Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) (quoting Mack v. United States, 814 F.2d 120, 124 (2d Cir.1987)); see also Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 205 (2d Cir. 2014) ("factual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial" (citation omitted)).

Here, Plaintiff testified at his deposition that after the six weeks of treatment at the Seafield Clinic he was no longer suffering from alcoholism.  (Devany Dep. (Dkt. No. 71-2) at 138:2-13)  Plaintiff's testimony is consistent with his EEOC charge.  (Devany Dep. (Dkt. No. 71-2) at 138:2-13; EEOC Charge (Dkt. No. 86) at 2 ¶ 8)  Given this record, Plaintiff cannot create an issue of fact by contradicting the statements in his deposition and EEOC charge. Buttry, 68 F.3d at 1493; Wein, 2020 WL 4903997, at *12.  Accordingly, Plaintiff has not shown that his alleged alcoholism impairs a major life activity such that he is disabled under the ADA. Vandenbroek, 356 F. App'x at 459 n.2.  Accordingly, the Court next addresses whether Plaintiff was "regarded as" disabled under the ADA.  42 U.S.C. § 12102(1)(C).[20]

---

[20]  As noted above, the "definition of 'disability' is broader under . . . the NYSHRL   . . . than under the ADA."  Hernandez, 2015 WL 321830, at *25 (citing N.Y. Exec L. § 292(21)).  "Under the NYSHRL . . . any medically diagnosable impairment is necessarily a disability for discrimination-claim purposes."  Lyman, 2014 WL 3417394, at *6 (citation, quotation marks, and alternation marks omitted).  The NYSHRL's broad definition of disability "does not require individuals to demonstrate that their impairment limits a 'major life activity.'"  Hristova v. 3321 Astoria Inc., No. 17-CV-1633 (RER), 2018 WL 4006880, at *10 (E.D.N.Y. June 27, 2018).

### b.    Whether Plaintiff Was "Regarded As" Having a Disability

In arguing that he has made out a prima facie case of disability discrimination,

Plaintiff claims that he was "regarded as" being disabled.  (Pltf. Br. (Dkt. No. 76) at 16-19)

"When a plaintiff brings a claim on the basis [] that his employer regarded him as disabled, the

decisive issue is the employer's perception of his or her employee's alleged impairment."  Sacks

v. Gandhi Eng'g, Inc., 999 F. Supp. 2d 629, 633 (S.D.N.Y. 2014) (citation and quotation marks

omitted).

Prior to the ADA Amendments Act of 2008 ("ADAAA"), "a plaintiff who alleged

[he] was 'regarded as' having a disability was required to show that the perceived disability was

one that 'substantially limited a major life activity.'"  Jordan v. Forfeiture Support Assocs., 928

F. Supp. 2d 588, 605 (E.D.N.Y. 2013) (citation omitted).  The ADAAA "set[s] forth a new, more

lenient, standard for determining whether an individual is 'regarded as disabled[, however].'"  Id.

at 605-06 (citation omitted).  Under the more lenient ADAAA standard, a plaintiff "is not

required to show that the disability []he is perceived as suffering from is one that actually limits,

or is perceived to limit, a major life activity."  Sacks, 999 F. Supp. 2d at 635 (citations and

quotation marks omitted).  Instead,

> [a]n individual meets the requirement of 'being regarded as having such an
> impairment' if the individual establishes that he . . .  has been subjected to an

---

Moreover, the NYSHRL "treat[s] alcoholism as an impairment that can form the basis of
disability discrimination suit."  Makinen, 857 F.3d at 495.  Given the record evidence that
Plaintiff took disability leave in February 2017 and was then treated for alcohol abuse over the
next six weeks (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 97; Def. R. 56.1 Counterstatement
(Dkt. No. 77) ¶ 97), this Court finds – for purposes of Plaintiff establishing a prima facie case of
disability discrimination under the NYSHRL – that he suffered from a "medically diagnosable
impairment."  See Grullon v. S. Bronx Overall Econ. Dev. Corp., 712 N.Y.S.2d 911 , 914 (N.Y.
Civ. Ct. 2000) (finding that plaintiff's testimony "adequately demonstrated that his ingestion of
alcohol was compulsive and beyond his control and that it 'impair [ed] normal functioning.'
Nothing in the case law or statutory framework of the . . . [NYSHRL] requires plaintiff to
introduce medical evidence to prove his disability of alcoholism.").

> action prohibited under this Act because of an actual or perceived physical or
> mental impairment whether or not the impairment limits or is perceived to limit a
> major life activity.

42 U.S.C. § 12102(3)(A); see also Jordan, 928 F. Supp. 2d at 606.

As a result of the ADAAA, a plaintiff need not show that he is suffering from a

disability that "actually limits" or is even "perceived to limit, a major life activity." Jordan, 928

F. Supp. 2d at 606 (citation and quotation marks omitted). It is sufficient for plaintiff to show

that he is "'regarded as having such an impairment.'" 42 U.S.C. § 1202(3)(A). "Nonetheless, a

plaintiff is still required to provide evidence suggesting that the employer perceived the

employee as having an impairment." Sacks, 999 F. Supp. 2d 629 at 635. "Accordingly, to

survive summary judgment, a plaintiff is required to raise a genuine issue of material fact as to

whether the employer regarded him as having a mental or physical impairment," id. at 633

(citation and quotation marks omitted), and whether plaintiff "suffered an adverse employment

action because of his disability or perceived disability." Capobianco v. City of New York, 422

F.3d 47, 56 (2d Cir. 2005).

In support of his claim that UPS perceived him as disabled, Plaintiff cites his

interactions with Division Manager Francis. (Pltf. Br. (Dkt. No. 76) at 18) Francis knew that

Plaintiff "had been out on disability leave to obtain treatment for alcoholism." (Id. (citing

Francis Dep., Ex. 8 (Dkt. No. 75-9) at 53:15-20)) Indeed, at Francis's deposition, when asked

whether he was "aware that after the reasonable cause determination that [Plaintiff] went out on

disability to get treatment for alcoholism?" Francis answered, "Yes, I am." (Francis Dep., Ex. 8

(Dkt. No. 75-9) at 53:15-20)

Plaintiff further asserts that Francis's "abrupt firing" of him, after returning from

treatment, "suggests that Francis[] perceived [him] as incapable of working and not fully

24

functioning." (Pltf. Br. (Dkt. No. 76) at 18 (citing Devany Decl. (Dkt. No. 75-3) at ¶ 12))
Acknowledging that Plaintiff was able to obtain reinstatement through the EDR process, this
sequence of events supports Plaintiff's argument that Francis viewed Plaintiff as suffering from
an impairment.

                         Plaintiff's deposition testimony – as supplemented by consistent statements in his
declaration – tends to support his claim that, after Plaintiff's return to work, Francis viewed him
as suffering from an impairment. Francis repeatedly asked Plaintiff whether he was "okay" or
"all right," suggested that he should work at a different UPS location, and stated that "he should
have never gave [Plaintiff his] job back." (Devany Dep. (Dkt. No. 75-2) at 282:21-25, 283:1-21)
After Plaintiff returned to work, Francis "would approach [Plaintiff] very closely whenever he
saw [Plaintiff] and say in a mocking tone, 'are you ok?'" (Devany Decl. (Dkt. No. 75-3) at ¶ 26)
"From [Francis's] intonation, he made it seem as though [Plaintiff] was not stable and that there
was something wrong with [him]." (Id. at ¶ 27) "During dispatch, he would hover over and
scrutinize [Plaintiff's] job performance as though [Plaintiff] did not know what [he] was doing."
(Id. at ¶ 28) "Francis also started critiquing for issues which [Plaintiff] had never been critiqued
for in [his] 17 years as a supervisor." (Id. at ¶ 29) "For example, [Plaintiff] did not use dispatch
sheets prior to [his] disability leave in February 2017." (Id. at ¶ 30) "However, upon [his]
return, Francis was threatening [Plaintiff] that if [he] did not use dispatch sheets, he would send
[him] to work out in Suffolk since they did not use dispatch sheets there." (Id. at ¶ 31) [21]

---

[21] Plaintiff also complains that, at the November 2, 2017 termination meeting, Francis mocked
Plaintiff's explanation for why he had not attended the required counseling sessions. (See Pltf.
Br. (Dkt. No. 76) at 25-26 (arguing that when Francis said, "'We know, we know, you tried to
call the therapists,'" he did so in a "manner and tone . . . [that] made it obvious that [he] was
ridiculing [Plaintiff] rather than actually listening to him"))

Given Plaintiff's "minimal burden" in establishing a prima facie case, and drawing all inferences in Plaintiff's favor, the Court concludes that Plaintiff has established – for purposes of both his ADA and NYSHRL claim – that there is a genuine question of material fact as to whether Plaintiff was "regarded as" disabled by Francis.

### c.   Whether Plaintiff Suffered an Adverse Employment Action Because He Was Regarded As Suffering From a Disability

UPS argues that "Plaintiff's prima facie case fails for the separate and independent reason that there is no evidence that any adverse employment action was taken because of his alleged disability." (Def. Br. Dkt. No. 72) at 19 (emphasis in original)) According to UPS, after Plaintiff's return to work in June 2017, he suffered no adverse employment action until he failed to comply with the terms of the Last Chance Agreement and the Alcohol Rehabilitation Agreement. (Id. at 19-20)

As discussed above, to establish a prima facie case of disability discrimination, a plaintiff must show "that he suffered an adverse employment action because of his disability." Brady, 531 F.3d at 134. "An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment." Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019) (citation and quotation marks omitted). At this fourth prong of the prima facie test, a plaintiff can "demonstrat[e] that the sequence of events leading up to [his] termination raises an inference of discrimination, or by providing proof of actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." Nash v. HomeGoods, Inc., No. 16-cv-1043(AMD)(VMS), 2019 WL 1433049, at *8 (E.D.N.Y. Mar. 29, 2019) (citations and quotation marks omitted). Moreover, "[a]t the prima facie stage, a strong showing of temporal proximity between evidence of a plaintiff's disability and an adverse action can raise an inference of

26

discrimination." <u>Stryker v. HSBC Sec. (USA)</u>, No. 16-cv-9424 (JGK), 2020 WL 5127461, at *9 (S.D.N.Y. Aug. 31, 2020).

Here, Plaintiff's alleged alcoholism first came to light on February 22, 2017, when he reported to work at 7:15 a.m. while under the influence of alcohol.  (Def. R. 56.1 Stmt (Dkt. No. 71) ¶ 31)  He then underwent treatment for his alleged alcoholism, and returned to work on June 2, 2017.[22]  His termination took place on November 2, 2017.  (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶¶ 66, 88)  Accordingly, more than eight months passed between the disclosure of Plaintiff's alcoholism and his termination, and five months passed between his return to work and his termination.  Either period of time is too lengthy to argue temporal proximity.  <u>See</u>, <u>e.g.</u>, <u>Zelasko v. NYC Dep't of Educ.</u>, No. 20-civ-5316 (RRM) (LB), 2021 WL 2635121, at *2 (E.D.N.Y. June 25, 2021) ("To be sure, courts in this circuit have held that the temporal proximity of an employee's disclosure of a disability to his termination support an inference of discrimination.  However, cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a <u>prima</u> <u>facie</u> case uniformly hold that the temporal proximity must be very close." (citations and quotation marks omitted)).  The Court concludes that Plaintiff has not established a <u>prima</u> <u>facie</u> case for purposes of his ADA and NYSHRL claims, even acknowledging his "<u>de</u> <u>minimis</u>" burden.

This Court will nonetheless continue the <u>McDonnell-Douglas</u> analysis because – even if Plaintiff had made out a <u>prima</u> <u>facie</u> case – his claims fail at the third stage of that analysis.

---

[22]  Acknowledging that Plaintiff was first terminated on May 8, 2017, he was – as discussed above – quickly reinstated.

### 2.   <u>The Alleged Non-Discriminatory Reason for Plaintiff's Termination</u>

Having concluded that Plaintiff has satisfied the first prong of the <u>McDonnell</u> <u>Douglas</u> test for purposes of his ADA and NYSHRL disability discrimination claims, the Court turns to whether Defendant UPS has "articulate[d] some legitimate, nondiscriminatory reason for the adverse employment action."  <u>United States v. Brennan</u>, 650 F.3d 65, 93 (2d Cir. 2011) (citation and quotation marks omitted); <u>see</u> <u>also</u> <u>Clark v. Jewish Childcare Ass'n, Inc.</u>, 96 F. Supp. 3d 237, 249 (S.D.N.Y. 2015) ("At the second step [of the <u>McDonnell Douglas</u> test], the defendant must produce evidence which supports a clear and specific explanation for the termination, and which, <u>taken as true</u>, would <u>permit</u> the conclusion that there was a nondiscriminatory reason for the adverse action" (citation and quotation marks omitted) (emphasis in original)).  The defendant's burden at this stage is "one of production, not persuasion."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000) (citation and quotation marks omitted).

Here, Defendant UPS argues that there were "legitimate, non-discriminatory reasons for terminating Plaintiff:  violation of his Last Chance Agreement and [the Alcohol Rehabilitation Agreement]."  (Def. Br. (Dkt. No. 72) at 20)  According to Defendant, "[t]he law is well settled that ending an employment relationship because an employee violates a last-chance agreement constitutes, as a matter of law, a legitimate, non-discriminatory basis for termination.  Indeed, courts, including in the Second Circuit, consistently have held as such." (<u>Id.</u> (citing cases))

In response, Plaintiff states that while he "does not dispute the notion that a violation of a Last Clear Chance Agreement can be a legitimate reason for terminating an employee, Defendant's complete reliance on this defense is fatal to their case.  In looking at all

28

the circumstances surrounding Defendant's actions, it is clear that Defendant's stated reason is pretext."  (Pltf. Br. (Dkt. No. 76) at 22)

Courts in this Circuit have repeatedly held that "[t]erminating [p]laintiff[s] for violating . . . last chance agreement[s] constitutes a legitimate, non-discriminatory justification for termination."  Merkl v. Allied Bldg. Prods., Corp., No. 09-CV-03085 (DLI) (JMA), 2013 WL 1346032, at *9 (E.D.N.Y. Mar. 28, 2013); see also Manns v. United Airlines, No. 13-CV-3668 (CBA) (LB), 2016 WL 6826761, at *10 (E.D.N.Y. Nov. 17, 2016) ("[R]ather than fire [plaintiff] immediately – as it would have been justified in doing – [defendant] . . . offered [plaintiff] the opportunity to continue his employment pursuant to a Last Chance Agreement, which required that he participate in [defendant's] Employee Assistance Program and submit to a behavioral health evaluation"; noting that a failure to abide by a last chance agreement is a "legitimate, nondiscriminatory justification" for a termination).

In Mayo v. Columbia University, for example, the court concluded that plaintiff likely "would have been terminated had he not requested a medical leave to pursue treatment for alcoholism."  No. 01 Civ. 2002 (LMM), 2003 WL 1824628, at *6 (S.D.N.Y. Apr. 7, 2003). Defendants made it clear to plaintiff that he needed to "comply with the return to work agreement," or else "he would be terminated."  Id.  Plaintiff did not comply with the return to work agreement, however, and defendants' termination of his employment was lawful because of plaintiff's failure to abide by the agreement, which constituted "a legitimate, non-discriminatory basis" for the termination.  Id. at *6-7.

Here, it is undisputed that (1) Plaintiff signed the Last Chance Agreement (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶¶ 66-67; see also Pltf.. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 67; and (2) the Last Chance Agreement provides that Plaintiff "understands that he will fully

comply with the terms of his SAP program and be subject to the aftercare specifications of said program." (Devany Dep., Ex. 16 (Dkt. No. 71-4) at 3; see also Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 69) Plaintiff also concedes that he "knew that his failure to comply [with the Last Chance Agreement] constituted grounds for termination." (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 70) It is also undisputed that over the five-month period between his June 2, 2017 return to work and his November 2, 2017 termination, Plaintiff completed only one of the six mandated counseling sessions. (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 72 (citing Devany Decl. (Dkt. No. 75-3) at ¶ 38))

It is likewise undisputed that in the Alcohol Rehabilitation Agreement, Plaintiff agreed to "attend aftercare treatment programs as outlined by [his] aftercare treatment professional . . . for the period of time recommended," and that "[f]ailure to comply with the aftercare treatment program," would "result in [his] discharge from [UPS]." (Devany Dep., Ex. 12 (Alcohol Rehabilitation Agreement) (Dkt. No. 71-11); see also Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 53)

Finally, it is undisputed that in the ASAP May 8, 2017 letter to Plaintiff, he was notified that he was obligated to attend one counseling session per week for six weeks (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶ 51; see also Devany Dep., Ex. 15 (Dkt. No. 71-13)), and that a "failure to comply with . . . the aftercare program requirements [] may jeopardize [Plaintiff's] employment." (Id.)

This Court concludes that – in citing Plaintiff's violation of the Last Chance Agreement and the Alcohol Rehabilitation Agreement – UPS has provided a "legitimate, non-discriminatory reason" for Plaintiff's termination.

C.      **Whether the Proffered Non-Discriminatory Reason
        <u>for Plaintiff's Termination Is Pretextual</u>**

Because UPS has proffered a legitimate, non-discriminatory reason for Plaintiff's

termination, "the burden shifts to Plaintiff to demonstrate that . . . [UPS's reason] is 'merely a

pretext for discrimination.'"  <u>Clark</u>, 96 F. Supp. 3d at 254-55 (citation omitted).

UPS contends that there is no evidence of pretext, citing Plaintiff's violation of

the Last Chance Agreement and the Alcohol Rehabilitation Agreement; the clear warning in

these agreements that a failure to comply will result in dismissal; and Plaintiff's failure to offer

evidence of disparate treatment – <u>i.e.</u>, that similarly situated employees were treated differently.

(Def. Br. (Dkt. No. 72) at 24-27)

Plaintiff argues that, "[i]n looking at all the circumstances surrounding [UPS's]

actions, it is clear that [UPS's] stated reason [for termination] is pretext."  (Pltf. Br. (Dkt. No. 76)

at 22)  In support of his claim of pretext, Plaintiff cites (1) Francis's May 8, 2017 termination of

Plaintiff; (2) Francis's "derisive comments and actions" between June and November of 2017,

and his "mocking comments during the termination meeting"; (3) "ASAP's ability and practice

of continuing to work with employees who had received violations memos"; (4) "the

circumstances surrounding the alleged enforcement of the Last Clear Chance Agreement"; and

(5) alleged inconsistencies in UPS's answers to interrogatories and in the testimony of UPS

witnesses.  (<u>Id.</u> at 23)

At the third stage of the <u>McDonell Douglas</u> analysis, "the plaintiff 'must put forth

adequate evidence to support a rational finding that the legitimate non-discriminatory reasons

proffered by the employer were false, and that more likely than not the employee's [disability]

was the real reason for the discharge.'"  <u>Clark</u>, 96 F. Supp. 3d at 249 (citation omitted).

Plaintiff's burden at this stage is "'higher than that which [is] applied for analyzing the <u>prima</u>

facie case.'"  Id. at 255 (citation omitted).  "'The plaintiff retains the ultimate burden of persuasion,' but 'summary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact.'"  Id. at 249 (citation and alteration marks omitted).  "'[T]he key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of the plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination.'"  Id. at 255 (citation and alteration marks omitted); see also Reeves, 530 U.S. at 143 ("Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" (citation and quotation marks omitted)); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (citation, quotation marks, and alteration marks omitted)).

The Court considers below Plaintiff's alleged evidence of pretext.

### 1.      The May 8, 2017 Termination

On February 22, 2017, Plaintiff reported to work under the influence of alcohol, a condition that clearly violates UPS policies.  (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶¶ 13, 18, 35-36)  He subsequently attended a six-week alcohol abuse treatment program.  (Id. at ¶¶ 40-42)  On May 8, 2017, Plaintiff's UPS employment was terminated, based on his violation of UPS policies.  (Id. at ¶ 54)  Plaintiff "was also informed [at that time] of his right to use the EDR program to seek reinstatement."  (Id. at ¶ 55)  Plaintiff utilized the EDR program (id. at ¶ 58), and he was reinstated to his job on June 2, 2017.  (Id. at ¶¶ 60, 66).

Plaintiff contends that, under UPS's policies, "[a]n employee who reports to work under the influence [of alcohol] – regardless of whether he or she is recommended to attend treatment – is [not] terminated upon return from treatment."  (Pltf. R. 56.1 Counterstatement (Dkt. No. 74) ¶ 26)  Plaintiff further notes that "[c]ourts have confirmed that when defendants do not apply their own written policy this can be evidence of pretext."  (Pltf. Br. (Dkt. No. 76) at 23)

The May 8, 2017 termination of Plaintiff's employment is largely a moot point, however, because Plaintiff "quickly" obtained reinstatement as a result of UPS's EDR program. (See Def. R. 56.1 Stmt. (Dkt. No. 71) ¶¶ 55, 60, 66; see also Pltf. R. 56.1 Counterstatement (Dkt. No. 74) at ¶ 111 ("After [Plaintiff] was abruptly terminated, [he] initiated the EDR process and was quickly able to get his job back" (citing Devany Decl. (Dkt. No. 75-3) ¶ 16)))  The fact that Plaintiff was reinstated "quickly" undermines, rather than supports, an inference of pretext, because this sequence of events suggests that UPS was working with Plaintiff to resolve any issues he might have with alcohol abuse so that he could be reinstated to his position.[23]

## 2.   Francis's Remarks to Plaintiff After His Return to Work

Plaintiff contends that Francis's remarks to him after his return to work demonstrate animus, which "can be suggestive of pretext in discrimination cases."  (Pltf. Br. (Dkt. No. 76) at 25)  Having considered Plaintiff's deposition testimony and consistent statements in his declaration, the Court concludes that Francis's alleged remarks constitute very little evidence of discriminatory animus.  Indeed, Plaintiff does not allege that Francis ever alluded to his use of alcohol, his alleged alcoholism, or the treatment Plaintiff received prior to his return to work.  In sum, Francis's alleged remarks do not demonstrate that UPS's proffered

---

[23]  Plaintiff also released any claims relating to the May 8, 2017 termination.  (See Last Chance Agreement (Dkt. No. 71-14))

reason for its termination of Plaintiff's employment is pretextual.  See Mayo, 2003 WL 1824628, at *1, 7 (finding that manager's statement – "I am supposed to take your word for that? You have no credibility. You are an alcoholic." – did not constitute persuasive proof of pretext where plaintiff's "return to work agreement required weekly progress reports, which plaintiff failed to submit").

### 3.    ASAP's Work With Other Employees

Plaintiff contends that, in the past, "UPS had asked ASAP to continue working with employees who had been found to be [in] violation [of their Last Chance and Alcohol Rehabilitation agreements]."  (Pltf. Br. (Dkt. No. 76) at 26)  In support of this argument, Plaintiff cites to the deposition testimony of Kathy Leaman, an ASAP case manager responsible for Plaintiff.

As discussed above, on October 9, 2017, Leaman sent a memorandum to UPS stating that Plaintiff had not attended six counseling sessions and thus was not in compliance with his mandated aftercare program.  (Def. R. 56.1 Stmt. (Dkt. No. 71) ¶ 84)  At deposition, Leaman was asked whether UPS ever directed her agency to continue working with an employee after such a violation memorandum was issued:

> Q: . . . . I want to back up because I may not have asked a very clear question.  I think I asked if UPS had ever asked you to continue on after discharge.  Maybe I said any employer.  But I was referring to UPS.  So, what is your answer to that question?
>
> A: Have they asked us to continue on with the case after they received a violation memo?
>
> Q: Yes.
>
> A: Yes, we've had cases in that situation.
>
> Q: How many of those have you had cases like that?

A: I honestly don't know.

Q: Would you say it's common or rare?

A: Rare.

(Goldberg Decl., Ex. 5 (Leaman Dep.) (Dkt. No. 75-6) at 87:4-18)

This testimony does not constitute proof of pretext, because the record contains no evidence that other UPS supervisors – who (1) were either alcoholics or who were perceived to be alcoholics; (2) signed Last Chance Agreements and Alcohol Rehabilitation Agreements; and (3) violated those agreements by not attending mandated treatment – were not terminated. In the absence of such comparators, there is no evidence of disparate treatment.

### 4.     Alleged "Suspect Circumstances" Surrounding the Enforcement of the Last Chance Agreement

Plaintiff argues that there were "suspect circumstances surrounding" the enforcement of the Last Chance Agreement. (Pltf. Br. (Dkt. No. 76) at 26) In support of this argument, Plaintiff notes that he "was never given a deadline by which to complete all the sessions nor was he ever told that the sessions had to be completed in consecutive weeks." (Id.) Plaintiff also notes that he made numerous calls to his ASAP caseworker in an effort to complete the sessions. (Id.)

This evidence does not change the fact that an employee's violation of a last chance agreement is a legitimate, non-discriminatory reason for terminating that employee. There is no dispute here that (1) Plaintiff knew that his last chance agreement required him to attend six aftercare counseling sessions, one per week; (2) over a five-month period he attended only one such session; (3) Plaintiff knew that a failure to comply with the aftercare program requirement would result in his termination; (4) Plaintiff never told UPS – prior to the day that he was terminated – that he was having difficulty scheduling the counseling sessions; and (5)

UPS terminated Plaintiff's employment after being informed by the treatment provider that Plaintiff had attended only one counseling session.  (Def. R. 56.1 Stmt. (Dkt. No. 71) at ¶¶ 51, 65, 70, 73, 84)  The "surrounding circumstances" of UPS's enforcement of the Last Chance Agreement  provide no basis for a finding of pretext.  See Mayo, 2003 WL 1824628, at *6-7 (finding that "defendants [had] proffered a legitimate, non-discriminatory basis for plaintiff's termination, namely his failure to comply with the conditions of his return to work agreement," and that disparaging comments were insufficient to show pretext, as "the bottom line is that the return to work agreement required weekly progress reports, which [the] plaintiff failed to submit"); see also Mararri v. WCI Steel, Inc., 130 F.3d 1180, 1182 (6th Cir. 1997) ("Only if the [last chance agreement] is invalid can the plaintiff prevail, because it is clear that [the defendant] discharged him for violating the agreement, not for being an alcoholic."); Golson-El v. Runyon, 812 F. Supp. 558, 561 (E.D. Pa. 1993) ("To attribute the firing to alcoholism is defective reasoning that skips the key step of reality, i.e., the prior accommodation to alcoholism by the Last Chance Agreement.  Such defective reasoning would render Last Chance Agreements nugatory, because every breach would be attributed to a development connected to an alcoholic's problems."); Brock v. Lucky Stores, Inc., 23 F. App'x 709, 712 (9th Cir. 2001) ("This Court and others have consistently found no disability discrimination in discharges pursuant to violations of [return to work] agreements.").

### 5.   Alleged Inconsistencies in the Testimony of UPS Witnesses

Plaintiff contends that "a host of significant contradictions between several UPS management employees . . . expose the falsity of [UPS's] version [of events]."  (Pltf. Br. (Dkt. No. 76) at 27)

36

The primary inconsistency cited by Plaintiff relates to whether the decision to terminate Plaintiff's employment was a group decision or Francis's decision. (Id.) Although pretext can be demonstrated by "implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate non-discriminatory reasons for its action," McNulty v. Cnty. of Warren, 1:16-cv-843 (NAM/DJS), 2019 WL 1080877, at *14 (N.D.N.Y. Mar. 7, 2019) (citation and quotation marks omitted), here it matters not whether Francis made the decision or he was part of a group that made the decision. What matters is that Plaintiff has not proffered evidence showing that Francis or any other UPS manager decided to terminate his employment because of his alleged alcoholism, as opposed to his violation of the Last Chance Agreement and the Alcohol Rehabilitation Agreement.

Because Plaintiff has not met his burden to demonstrate that UPS's proffered non-discriminatory reason for his termination is pretextual, UPS is entitled to summary judgment on Plaintiff's ADA and NYSHRL claims.

**B.     NYCHRL Claim**

Having determined that Defendant is entitled to summary judgment on Plaintiff's sole federal claim, the Court must now reassess whether it should exercise supplemental jurisdiction over Plaintiff's remaining NYCHRL claim. In doing so, the Court must consider "several related factors – judicial economy, convenience, fairness, and comity." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004); see also 28 U.S.C. 1367(c)(3) ("district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Kolari v. New York-

Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

   Here, it was appropriate for the Court to consider Plaintiff's ADA and NYSHRL claims together, because these claims are largely governed by the same legal standards.  See, e.g., Rodal, 369 F.3d at 117 n. 1 ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims.").  As discussed above, however, "'[c]ourts must analyze NYCHRL claims independently from any federal and state law claims,'" because the "'NYCHRL creates a lower threshold for actionable conduct and must be construed liberally in favor of discrimination plaintiffs, meaning that a defendant may be liable under the NYCHRL but not under state or federal statutes.'"  Piligian, 490 F. Supp. 3d at 717 (citations omitted).  Because an NYCHRL claim requires a separate analysis, the "Court's retention of jurisdiction will not significantly conserve judicial resources."  Williams v. Geiger, 447 F. Supp. 3d 68, 88 (S.D.N.Y. 2020).  Accordingly, because Defendant is entitled to summary judgment on Plaintiff's ADA claim, the Court will decline to exercise supplemental jurisdiction over Plaintiff's NYCHRL claim.  See Piligian, 490 F. Supp. 3d at 717; Concepcion v. City of New York, 15 Civ. 2156 (AJP), 2016 WL 386099, at *21 (S.D.N.Y. Jan. 29, 2016), aff'd, 693 F. App'x 31 (2d Cir. 2017) (ruling on the Title VII, ADA, ADEA, and NYSHRL claims, but declining to exercise supplemental jurisdiction over the NYCHRL claim).

## **CONCLUSION**

For the reasons stated above, UPS's motion for summary judgment is granted as to Plaintiff's ADA and NYSHRL claims.  The Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claim, and dismisses that claim without prejudice.  The Clerk of Court is directed to terminate the motion (Dkt. No. 70) and to close this case.

Dated:  New York, New York
        September 30, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge